## DONNELL v. PRUDENTIAL LIFE INS. CO. OF AMERICA.
### No. 16054.

Court of Appeal of Louisiana. Orleans.
April 29, 1935.

John J. Wingrave, of New Orleans, for appellant.

Edward Dinkelspiel, of New Orleans, for appellee.

LECHE, Judge.

Plaintiff's minor son, Lloyd Donnell, was the named insured in three policies of insurance issued by the Prudential Insurance Company of America bearing the numbers 77391183, 61751146, 71751147. The insured died on December 13, 1933, and defendant paid plaintiff the amount named in each of said policies, or a total of $488, but refused to pay double this amount under the double indemnity features of the said policies. Plaintiff then filed this suit claiming a like amount under the double indemnity provisions and, from an adverse judgment, has appealed to this court.

The clause in question contained in each of the said policies or attached thereto by indorsement reads as follows:

"Upon receipt of due proof that the Insured after attainment of age 15 and prior to the attainment of age 70, has sustained bodily injury, solely through external, violent and accidental means, occurring after the date of this policy and resulting in the death of the Insured within ninety days from the date of such bodily injury while this Policy is in force, and while there is no default in the payment of premium, the Company will pay in addition to any other sums due under this policy and subject to the provisions of this policy an Accidental Death Benefit equal to the face amount of insurance stated in this Policy less the amount of any disability benefit which has become payable under this Policy on account of the same bodily injury, except as provided below."

The record discloses that the insured, Lloyd Donnell, met his death in the swimming pool of the Y. M. C. A. in the City of New Orleans. Two reputable physicians gave their testimony.

Dr. Julian Graubarth testified on behalf of defendant that he was in the Y. M. C. A. building at the time the death occurred and was summoned as soon as the body was removed from the pool. His examination, at that time, disclosed that the insured was dead. Dr. Graubarth said that in his opinion drowning was not the sole cause of death and

in explanation of this statement, on direct examination, gave the following reasons:

"A. My reasons are these: It is quite evident that the boy was subject to convulsions. I mean, the history of his case brings it out. Now, it is true that he was found dead in the water and the autopsy revealed that he had the classical signs of drowning; that is, water in the lungs, etc. But while that is so, if he had not had some convulsion, he probably would not have died. Now, why did he have a convulsion in the water? If we understand the mechanism of epilepsy and convulsions, it is quite clear why it happened. For instance, the boy was swimming and taking breaths, forming inspiration and expiration, and when one breathes with forcible inspiration, that, in turn, increases the blood pressure, and that, in turn, increases the intracranium pressure, and that, in turn, is enough to cause drowning, subject to convulsions to start off stimuli and the first convulsion.

"Now, we will say that happened because I think the records show it.

"When a person has a convulsion, the beginning of a convulsion, he suddenly becomes unconscious, and while he becomes unconscious he makes a forcible expiration, and if he was unconscious at the bottom of the pool, he probably made a forcible inspiration which follows a few seconds after the forcible expiration and that, in turn—of course, he inhales water or sucks in water. Being unconscious, he is unable to struggle and naturally he just dies, as the result of being unable to being resuscitated.

"Q. Doctor, as an expert medical man, are you prepared to testify that drowning was not the sole cause of this boy's death? A. I think that is true, yes, sir.

"Q. Is that your opinion? A. My opinion is that he had a convulsion and that he was unconscious and inhaled or sucked in water and died as the result of inability to be resuscitated. It is true, he had water in his lungs and all that sort of thing, but I don't think that it was directly due to drowning. It was due to the convulsion that he had."

This physician was also present at the autopsy and, on cross-examination, testified as follows:

"Q. If he had the convulsion before he died and an autopsy was held on the body, would not the autopsy disclose whether or not death came from the convulsion? A. Well, I think that is difficult to answer, for this reason: The brain did show marked swelling, and that is one of the common findings in epilepsy. It is also a finding in drowning. But often it is a peculiar thing that epilepsy even don't show much pathology at the autopsy except by microscopic means, which was not done here. But he did show this condition of the brain, and that is enough to be one of the causes of epilepsy."

On the "Attending Physician's Certificate of Death," a printed form furnished by the Prudential Insurance Company of America, and signed by Dr. Graubarth, following the printed words "State the immediate cause of death," he wrote the word "drowning," and after the printed words "State the contributing cause of death," he wrote "convulsions," and immediately thereunder, in parenthesis, the word "epilepsy" and following both he put a question mark, showing that at the time of filling out the certificate, which is dated December 16, 1933, three days after death and subsequent to the autopsy, there was some doubt in his mind as to the contributing cause of death.

The other physician, Dr. George H. Hauser, who was assistant coroner at the time, in his official certificate following the printed words "Cause of death" stated: "Drowning—chronic fibrous meningitis, with convulsions—accidental." Dr. Hauser also filled out an "Attending Physician's Certificate of Death" similar to the one signed by Dr. Graubarth, and following the words "State the immediate cause of death," he wrote "drowning (accidental)," and after the words "State the contributing cause of death," he wrote "chronic fibrous meningitis with convulsions." Dr. Hauser, in his official capacity as assistant coroner, performed the autopsy and testified that in his opinion death was due to drowning. On cross-examination he said:

"Q. Doctor, you qualify that in your certificate. You say that the boy suffered from chronic fibrous meningitis with convulsions. Would not you say that was a contributory cause to his death? A. Contributory in that, if he had an epileptic attack while in the water, drowning would ensue. * * *

"Q. You make the same notation on that certificate that you put on your report as Coroner, that he died of drowning associated with chronic fibrous meningitis, with convulsions? A. That is correct. We make any notation of any pathological condition at the autopsy.

"Q. What led you to believe he had convulsions? A. The history showed he had convulsions.

"The Court:

"Q. Is there anything to show that he had a convulsion at the time of his drowning? A. No, sir.

"Q. In the autopsy? A. No.

"Q. Could you have told by an examination that there was? A. Nothing to indicate it except meningitis, but that would not necessarily mean that he would have convulsions at that time. In other words, it might or might not have come on at that time."

The contention of defendant is that death was not due "*solely* through external, violent and accidental means" within the meaning of the above-quoted paragraph of the policy, and it attempted to show that death in this case was due to drowning *and* convulsions or epilepsy, therefore, not occurring *solely* through external, violent, or accidental means.

The record discloses that the decedent was subject to epileptic fits or convulsions, having been treated therefor at the Charity Hospital some months prior to his death, and this condition was confirmed by the examination of the brain at the autopsy. There is absolutely nothing, however, aside from conjecture based on the decedent's medical history to show that he suffered an attack of epilepsy at the time he was drowned.

Everett Hale, a life guard at the Y. M. C. A. swimming pool, testified that he noticed nothing unusual until he saw decedent's body at the bottom of the pool. In fact, he said: "I was not standing there simply watching him, but he was in there a good bit of the time with only one or two others in the pool, and any untoward happening would have come to my knowledge. I don't know whether this would be noticeable to every person, but in this capacity, you develop a sort of sense or comprehensive understanding of what is going on around you, having a struggle or anything of that nature. You just automatically have it registered upon your consciousness." He further testified that the only thing which attracted his attention was the fact that young Donnell stayed down too long because "there was absolutely no peculiar expression on his face." This testimony of the life guard, trained in observation, certainly destroys the belief that decedent was the victim of a fit or convulsion of any kind.

The only other witness present appears to have been Nicholas Frischertz, swimming instructor, who, like Mr. Hale, noticed the body at the bottom of the pool and assisted in taking it out.

Now reverting to the medical testimony, it will be seen that there is nothing therein tending to prove that Donnell suffered a stroke or convulsion of any kind at the time of his death. The physicians' testimony as to epilepsy or meningitis is based solely on the deceased's medical history and the fact that the brain showed a marked swelling which is a common finding in epilepsy and also in drowning. Dr. Hauser testified positively that there was nothing to show that he had a convulsion at the time of drowning.

But assuming arguendo that the record disclosed affirmatively that Donnell had an epileptic fit or convulsion while in the pool and therefore drowned, can it be said that his death was not due *solely* to accidental means? We think not, because the fit or convulsion would not have contributed to the death, but only to the drowning, as distinguished from a heart attack or some other fatal occurrence which contributes directly to the death itself. In other words, if a person, while in swimming, merely fainted or suffered what is commonly termed a cramp and while thus unconscious drowned, it could not be said that the death was not solely accidental, but in the case of a heart attack or some other fatal disease death would be brought about whether the attack occurred in the water or on shore and in such a case death is not solely accidental.

In the case of Konrad v. Union Casualty & Surety Company, 49 La. Ann. 636, 21 So. 721, 723, death by drowning was held to be caused "by external, violent and accidental means." There, the court said:

" 'Death by accident' is defined as an unexpected event,—not according to the usual course of things. Applying this definition, it has been held, that where a person is drowned while bathing, it is accidental death, although no proof is offered of the circumstances.

"Trew v. Railway Passenger Association, 6 Hurl. & N. 839. Also, where the insured fell in a fit in shallow water and was drowned, it was held to be a death by external and material causes."

For the reasons assigned the judgment appealed from is annulled, avoided, and reversed, and it is now ordered that there be judgment herein in favor of plaintiff, Robert L. Donnell, administrator succession of Lloyd Donnell, and against defendant, Prudential Insurance Company of America, in the sum of $488 together with legal interest from judicial demand until paid, and for all costs.

Reversed.

JANVIER, J., absent, takes no part.